UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS HALLORAN,                     :
                                     :CIVIL ACTION NO. 3:17-CV-11
             Plaintiff,              :
                                     :(JUDGE CONABOY)
             v.                      :
                                     :
NANCY A. BERRYHILL,[1]           :
Acting Commissioner of               :
Social Security,                     :
                                     :
             Defendant.              :
                                     :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act. (Doc. 1.) Plaintiff
filed an application for benefits on November 9, 2013, alleging a
disability onset date of August 1, 2012. (R. 18.) After he
appealed the initial denial of the claim, a hearing was held on
August 4, 2015, and Administrative Law Judge ("ALJ") Michelle Wolfe
issued her Decision on October 6, 2015, concluding that Plaintiff
had not been under a disability from the alleged onset date of

_____

[1] Nancy A. Berryhill is now the Acting Commissioner of Social
Security. Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit. Fed. R. Civ. P. 25(d). No further action needs to be taken
to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g), which states
that "[a]ny action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying
the office of Commissioner of Social Security or any vacancy in
such office."

August 1, 2012, through the date of the decision.  (R. 40, 50.)
Plaintiff requested review of the ALJ's decision which the Appeals
Council denied on February 6, 2017.  (R. 1-6.)  In doing so, the
ALJ's decision became the decision of the Acting Commissioner.  (R.
1.)

Plaintiff filed this action on January 3, 2017.  (Doc. 1.)  He
asserts in his supporting brief that the ALJ erred at step three in
his determination that Plaintiff did not meet the requirements of
Impairment Listings 1.02, 1.03, or 1.04 and when he afforded great
weight to the state agency reviewer's decision in assessing
Plaintiff's residual functional capacity ("RFC").  (Doc. 18 at 21-
22.)  After careful review of the record and the parties' filings,
the Court concludes this appeal is properly granted.

## I. Background

Plaintiff was born on August 16, 1963, and was forty-eight
years old on the date last insured.  (R. 26.)  He has a college
degree, served in the United States Air Force for four years, and
worked for the United States Postal Service for more than twenty-
four years as a mail clerk, letter carrier, and postmaster.  (R.
61; Doc. 18 at 3.)  He alleged disability as of August 1, 2012, due
to his progressive spinal condition, hip joint dysfunction, and
depression.  (Doc. 18 at 3.)  Plaintiff died on August 8, 2017.
(Doc. 24 at 1.)

***A. Medical Evidence***[2]

    Plaintiff had a partial laminectomy at the L4-5 level in 1985 while serving in the Air Force. (R. 472.) He had a second spinal fusion surgery at the same level in 1992 due to ongoing complaints. (*Id.*) Plaintiff ultimately had a third spinal surgery in 1993 to remove damaged hardware. (*Id.*) Citing evidence of a progressive spinal impairment leading up to the disability onset date (*see* Doc. 18 at 4-12 (internal citations omitted)), the first record evidence cited during the relevant time period is a December 20, 2012, visit with Dr. Metgud at the VA Medical Center in Wilkes-Barre, Pennsylvania (Doc. 18 at 12 (citing R. 421)). On December 20th, Plaintiff complained of chronic bilateral leg pain rated at 5/10 which he described as throbbing and aggravated by cold weather, walking, and activity. (R. 421.) He also complained of back pain. (R. 415.) Dr. Metgud noted that Plaintiff had spinal stenosis as per MRI done in September 2008, he had right hip replacement in 2006 and left hip replacement in 2011. (*Id.*) On examination, Dr. Metgud did not find edema, cyanosis, or clubbing of the extremities, and he found no local tenderness of the back but observed a scar in the lumbosacral region. (R. 415-16.) Plaintiff was directed to follow up with an outside surgeon for his chronic back pain and continue with vicodin. (R. 416.) Dr. Metgud's

---

[2] The evidence review focuses on that relied upon by the parties and the ALJ relevant to Plaintiff's claimed errors.

examination and recommendation were the same in August 2013.  (R. 831.)

September 2013 evaluation by the Departmant of Veterans' Affairs indicate a diagnosis of bilateral hip degenerative joint disease, bilateral total hip replacements, degenerative disc disease, lumbosacral spine, lumbar spinal stenosis status post lumbar laminectomy and fusion, and lumbar radiculopathy.  (R. 812, 820.)  Both the hip/thigh and spinal conditions resulted in daily pain flares.  (R. 813, 821.)

Plaintiff had a decreased range of motion in both hips with objective evidence of painful motion throughout.  (R. 813-14.) Functional loss and/or functional impairment of the hip and thigh were assessed bilaterally and, after repetitive use, the following contributing factors of disability were identified: less movement than normal; weakened movement; pain on movement; disturbance of locomotion; and interference with sitting, standing, and/or weight bearing.  (R. 816.)  Localized tenderness to palpation was noted for the joints/soft tissue of the right hip.  (*Id.*)  Findings also indicated degenerative or traumatic arthritis of both hips documented by imaging studies.  (R. 819.)  The Disability Benefits Questionnaire further indicated that Plaintiff's hip and/or thigh condition functionally impacted his ability to work due to pain, decreased mobility, and difficulty with prolonged standing, walking, or sitting.  (R. 819.)

4

Plaintiff had restricted lumbar flexion and extension as well as limited bilateral lateral flexion and rotation. (R. 822.) Functional loss and/or functional impairment of the thoracolumbar spine was assessed and the contributing factors of disability after repetitive use were identified to be the following: less movement than normal; weakened movement, excess fatigability; pain on movement; disturbance of locomotion; and interference with sitting, standing, and/or weight bearing. (R. 823-24.) The questionnaire indicated that Plaintiff had localized tenderness or pain to palpation of the lumbar spine, paraspinal and SI joint tenderness with palpation and movement. (R. 824.) It also indicated that Plaintiff had guarding or muscle spasm of the thoracolumbar spine severe enough to result in an abnormal gait. (*Id.*) Sensory exam showed decreased sensation to light touch of the upper anterior right thigh, the right thigh/knee, the right lower leg/ankle, and the right foot/toes. (R. 825.) Straight leg raising test was positive on the right and negative on the left. (*Id.*) Radiculopathy evaluation indicated that Plaintiff had radicular pain which could be excruciating at times: he had moderate constant pain in the right lower extremity and mild intermittent pain in the left lower extremity; he had severe paresthesias and/or dysesthesias in the right lower extremity and mild paresthesias and/or dysesthesias in the left lower extremity; and he had severe numbness in the right lower extremity. (R. 826.) Nerve root

involvement was identified at right L4/L5/S1/S2/S3. (*Id.*) The severity of the radiculopathy and side effects was assessed to be moderate. (*Id.*) Plaintiff's back condition was found to impact Plaintiff's ability to work due to pain, decreased mobility, difficulty with lifting, bending, twisting, and prolonged standing, walking or sitting. (R. 828.)

On January 18, 2014, Matthew Kozicki, M.D., saw Plaintiff for a disability evaluation. (R. 214.) At the time, Plaintiff rated his lower back pain as 8/10 in severity, intermittent in nature, and worsened by any type of bending, crouching, or activity. (*Id.*) Plaintiff also described radiation down his right leg and associated numbness and tingling. (*Id.*) Plaintiff listed his medications to be Naproxen, Flexeril, Vicodin, and hydrochlorothiazide. (R. 216.) Physical examination showed normal ambulation, no difficulty getting out of a chair but difficulty lying flat on the exam table, and no difficulty getting off the exam table. (R. 216.) Examination of the extremities was normal, lumbar spine flexion was limited to forty-five degrees laterally on the right and left it was fifteen degrees anterior to ten degrees, external rotation to ten degrees, hip flexion severely limited to twenty-five degrees, internal rotation right and left to ten degrees, and abduction and extension to ten degrees. (R. 217.) Straight leg testing was 40 on sitting right and left, and supine. (*Id.*) Plaintiff had difficulty laying straight back on the table.

(*Id.*)  He was unable to walk on his heels, toes, squat, and do heel-to-toe.  (*Id.*)  Sensation was grossly intact and deep tendon reflexes were normoactive.  (*Id.*)  Dr. Kozicki's impression included degenerative joint disease of the back in multiple levels status post multiple surgeries, and right and left degenerative joint disease of the hips status post total hip replacement bilaterally.  (R. 217-18.)

On March 14, 2014, Plaintiff reported to Dr. Metgud that he experienced numbness in both hands, right greater than left, and he wondered if it could be related to his neck problems.  (R. 775.)  No problems were noted on physical examination.  (R. 776.)  Plaintiff was directed to follow up with an outside surgeon for the chronic back pain.  (*Id.*)

On April 1, 2014, Dr. Metgud called Plaintiff to discuss EMG/NC results.  (R. 772-73.)  The EMG showed a diffused cervical polyradiculopathy mostly involving the lower trunk, C7-C8, C8-T1 bilaterally.  (R. 772.)  The NCV showed sensory more than motor mixed axonal demylinating neuropathic changes.  (*Id.*)  Dr. Metgud planned to get a cervical MRI.  (*Id.*)

The following Impression was recorded regarding the MRI of the cervical spine on April 14, 2014: congenital spinal canal stenosis with AP diameter of the canal measuring 9-10mm; superimposed protrusions at C5-C6 and C4-C5 resulting in moderate spinal canal stenosis; and right greater than left neural foraminal stenosis

greater at C5-C6 which could explain a right C6 radiculopathy if clinically present.  (R. 224.)  Lumbar MRI Impression of the same date indicated severe degenerative change at L4-L5 which was slightly worse than that found in 2010, and a benign cyst in the right L5-S1 neural foramen.  (R. 226-27.)

In Dr. Metgud's April 22, 2014, Clinic Note related to a call to Plaintiff to discuss the results of the MRIs, he noted that Plaintiff had the studies because Plaintiff's back and neck pain were getting worse.  (R. 772.)  Dr. Metgud also noted that the MRIs showed severe degenerative joint disease of the back, spinal canal stenosis in the neck, and foraminal stenosis.  (*Id.*)  His plan was for Plaintiff to see a pain management specialist.  (*Id.*)

On June 24, 2014, Plaintiff saw Thomas W. Hanlon, M.D., with the chief complaints of neck and back pain.  (R. 648.)  By history, Dr. Hanlon noted that Plaintiff reported cervical pain with bilateral cervical radicular radiation of pain increasing over the preceding months and conservative treatment had failed.  (*Id.*)  Plaintiff also reported a long-standing problem with back pain. (*Id.*)  Physical examination showed the following: decreased range of motion in the neck and pain on turning to the right; intact pulses in extremities with normal range of motion and no joint deformities; and neurologically motor 5/5 for all groups tested, slightly decreased right grip strength, grossly intact to light touch and normal gait.  (R. 651.)  Dr. Hanlon assessed neck pain,

bilateral cervical radiculopathy right greater than left and low back pain secondary to postlaminectomy pain syndrome. (*Id.*) Dr. Hanlon planned to add a Medrol Dosepak to Plaintiff's medication regimen, schedule a cervical epidural steroid injection, and address the lumbar complaints after the cervical issues resolved. (R. 651.) In an Addendum to the consultation record, Dr. Hanlon noted that April 14, 2014, imaging showed multifacorial cervical spine stenosis, lumbar spine postsurgical changes with a small cyst at the L5-S1 exit zone, and also lumbar spine extensive degenerative changes with multifactorial spinal stenosis. (R. 651-52.)

Plaintiff had a cervical epidural steroid injection to the cervical spine on August 7, 2014, and had a follow-up visit with Dr. Hanlon on September 8, 2014. (R. 731, 754.) Dr. Hanlon noted that Plaintiff reported significant pain reduction following the injection but he was still having some crepitus and a slight return of the pain at the time of the office visit. (R. 754.) Dr. Hanlon also noted that the low back pain remained. (*Id.*) Physical examination of the neck showed decreased range of motion in extension and pain on turning to the right. (R. 732.) No abnormal findings were noted regarding extremity, back, and neurological examination. (R. 732-33.) Dr. Hanlon assessed neck pain, bilateral cervical radiculopathy, and low back pain secondary to postlaminectomy pain syndrome. (R. 733.) He planned to repeat

cervical epidural injections and to address the lumbar complaints after the cervical issues resolved. (*Id.*)

At his October 22, 2014, visit to Dr. Metgud's office, Plaintiff reported a pain level of 4/10 with pain located in the neck, low back, hip, and right leg. (R. 717.) The provider reported that Plaintiff was taking Naproxen, Flexeril, and Tylenol for pain with some effect. (*Id.*)

In November 2014, Plaintiff reported to Dr. Hanlon that he had some improvement with his pain following cervical injections but he continued to have pain in his low back and heaviness in the bilateral lower extremities. (R. 705.) Dr. Hanlon planned to schedule lumbar spine injections. (R. 706.)

In January 2015, Plaintiff reported a ninety percent reduction in his right L4-5 radicular pain after the lumbar steroid injection, but he said he continued to have "horizontally radiating low back pin across his back and consistent with facet arthropathy" which was worse with prolonged sitting or standing. (R. 693.) At his April visit with Dr. Hanlon, Plaintiff said his lumbar pain was much better controlled following injections but he continued to have some lumbar radicular pain and ongoing cervical pain located at the base of his neck. (R. 975.) Dr. Hanlon planned to continue Plaintiff's medication regimen and schedule bilateral cervical facet injections. (R. 976.)

Plaintiff followed up with Dr. Metgud on June 1, 2015, at

which time Plaintiff reported his pain had improved after getting shots in the neck and back. (R. 967.)  Physical examination did not show any specific problems, and Plaintiff was advised to follow up with pain management for his chronic back pain and cervical radiculopathy.  (R. 968.)

At his June 29, 2015, visit with Dr. Hanlon, Plaintiff denied neck pain but said he experienced left cervical radicular pain that was increasing.  (R. 956.)  Plaintiff reported increased pain with activity.  (*Id.*)  He wanted to schedule a repeat cervical epidural steroid injection.  (*Id.*)  Physical examination of the neck showed decreased range of motion in extension and pain on turning to the right and slightly decreased right grip strength.  (R. 957.)  He was assessed to have neck pain, cervical spondylosis, and cervical radiculopathy.  (*Id.*)  The plan was to continue the medication regimen and schedule a left cervical epidural steroid injection. (*Id.*)

**B. *Opinion Evidence***

On January 18, 2014, Dr. Kozicki, the examining consultant, provided a Medical Source Statement.  (R. 218.)  He stated that Plaintiff

> was very cooperative and did give a good
> effort during the exam.  There was decrease
> ranged [sic] of motion as stated in the exam
> in the lumbar region on flexion and
> extension, rotation, as well as in all
> aspects of both hips.  The patient would be
> severely limited in his ability to sit,
> stand, and walk in an 8-hour work day.  He

11

> was able to work about a third of a regular
> work day due to his previous surgeries and
> pain.  The patient will be able to lift and
> carry low weight amounts, about 10 to 20
> pounds, for about one-third of a workday.  He
> would not be able to bend, stoop, or crouch
> in any way he had performed.  The patient did
> have severe limitation as far as that.  He
> had no limitations as far as fine motor
> manipulation such as grasping, handling, and
> reaching.

(R. 218.)

On February 4, 2014, Gerald A. Gryczko, M.D., completed a

Physical Residual Functional Capacity Assessment.  (R. 92-94.)  He

concluded that Plaintiff could lift and/or carry twenty pounds

occasionally and ten pounds frequently, stand an/or walk for a

total of about six hours in an eight-hour day and sit for the same

period of time, his ability to push and/or pull was limited in both

lower extremities, he could occasionally climb ramps/stairs,

balance and stoop, and he could never climb

ladders/ropes/scaffolds, kneel, crouch, or crawl.  (R. 93.)  In the

RFC Additional Explanation, Dr. Gryczko stated that Plaintiff had

advanced degenerative disc disease, and current physical findings

indicated significant limitation in range of motion.  (R. 94.)  He

noted that Plaintiff "described daily activities that are

significantly limited" which was "consistent with the limitations

indicated by other evidence in this case."  (*Id.*)  Dr. Gryczko

added

> [t]he medical evidence shows that despite ongoing
> treatment the claimant continues to have pain

12

which significantly impacts on his ability to
perform work-related activities.  The claimant did
undergo surgery for his joints which has not
resulted in significant improvement of his
symptoms.  The claimant's pain is so severe that
his physician has prescribed narcotic pain
medication.  All evidence was considered and the
claimant's statement(s) are found fully credible.

(R. 94.)

## C.    *Hearing Testimony*

Plaintiff testified at the August 4, 2015, hearing that he
retired from the postal service because he had too much pain to
make it through the day.  (R. 61-62.)  He said he did not do any
chores around the house or in the yard and he did not do any
physical therapy or exercising.  (R. 63-64.)  Plaintiff explained
that repetitive motion aggravated his back problems to the point
that he just could not do those activities.  (*Id.*) Plaintiff
reported that he occasionally went to the grocery store to pick up
a few things but he did not do big orders.  (R. 64.)

When asked how far he was able to walk before he had to stop
and take a break, Plaintiff responded that he was slower than most
people and could not really estimate the distance.  (R. 66.)  He
said he could stand for about fifteen to twenty minutes and then he
would change positions.  (*Id.*)  Regarding lifting, Plaintiff
reported that he occasionally helped his wife carry something from
the car or carry a bag of garbage.  (R. 67.)

Upon questioning by his attorney, Plaintiff stated that he was
considered one hundred percent disabled by the Veterans

13

Administration.  (*Id.*)

Plaintiff rated his neck pain at four out of ten early in the day and eight out of ten later.  (R. 73.)  He rated his back pain at four on good days and he said "it just basically stops me" on bad days.  (*Id.*)  Plaintiff also said he wakes up three or four times a night due to pain.  (*Id.*)  Plaintiff attributed his weight gain of about fifty pounds to a lack of activity, adding that he had much less energy than previously.  (R. 74.)

**D. ALJ Decision**

In her October 6, 2015, Decision, ALJ Wolfe determined Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine; degenerative joint disease of the hips; status post bilateral total hip replacement; cervical radiculopathy; obesity; and dysthymic disorder.  (R. 42.)  She also found that he had the non-severe impairment of malunion of the ankle and his reported carpal tunnel syndrome symptoms do not support a medically determinable impairment.  (R. 43.)  ALJ Wolfe concluded Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment.  (*Id.*)

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work except

> the claimant would have occasional pushing
> and pulling with the lower extremities;
> occasional balancing, stooping, and climbing,
> but never on ladders, ropes, or scaffolds; no
> kneeling or crouching; the claimant would
> need to avoid concentrated exposure to

14

> temperature extremes of cold and heat,
> wetness, humidity, vibrations, and hazards
> including moving machinery and unprotected
> heights; the claimant would require the
> option to transfer positions from sitting to
> standing throughout a workday, where the
> maximum interval per each transfer would be
> up to one hour before transferring, but he
> would not be off task while transferring; the
> claimant would be capable of frequent
> handling with the right (dominant) hand; the
> claimant would be limited to simple, routine
> tasks and no complex tasks.

(R. 44.)

ALJ Wolfe assigned limited weight to Dr. Kozicki's opinions, finding they were not fully supported by the record. (R. 47.) She assigned great weight to Dr. Gryczko's opinion, finding it well supported. (*Id.*)

Other relevant portions of the ALJ's Decision will be referenced in the Discussion section of this Memorandum.

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3] It is necessary for the

---

[3] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The Act further provides that an individual is disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant

---

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

16

work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 49-50.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing

17

> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."

*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where a claimed error would not affect the outcome of a case, remand is not required.  *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).  Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts in his supporting brief that the ALJ erred at step three in her determination that Plaintiff did not meet the requirements of Impairment Listings 1.02, 1.03, or 1.04 and when he

19

afforded great weight to the State agency reviewer's decision in assessing Plaintiff's RFC.  (Doc. 18 at 21-22.)  Defendant responds that substantial evidence supports the ALJ's step three determination and evaluation of medical source opinions.  (Doc. 21 at 7, 13.)

## A. Step Three

Because the parties' specific arguments focus on Listing 1.04 and ambulation considerations (Doc. 18 at 26-31; Doc. 21 at 7-12; Doc. 24 at 3-6), the Court will do the same.  Listing 1.04 addresses the requirements for establishing disability based on disorders of the spine.

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

20

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by finding on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

Listing 1.04C requires that a claimant satisfy Section 1.00B2b which provides as follows:

b. What we mean by inability to ambulate effectively.

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as

> shopping and banking, and the inability to
> climb a few steps at a reasonable pace with
> the use of a single hand rail.  The ability
> to walk independently about one's home
> without the use of assistive devices does
> not, in and of itself, constitute effective
> ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.  Listings 1.02

addressing Major Dysfunction of Joints, also considers the

inability to ambulate effectively.  *See* 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 1.02.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third

Circuit Court of appeals emphasized that "'[f]or a claimant to show

his impairment matches a listing, it must meet all of the specified

medical criteria.  An impairment that manifests only some of those

criteria, no matter how severely, does not qualify.'"  *Id.* at 504

(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  *Jones* also

stated that there is no particular language or format that an ALJ

must use so long as there is "sufficient development of the record

and explanation of findings to permit meaningful review."  *Id.* at

505.  Furthermore, as noted in *Hernandez v. Comm'r  of Soc. Sec.*,

198 F. App'x 230, 235 (3d Cir. 2006) (not precedential), if the ALJ

finds no documentation of required signs, there is nothing more he

could have discussed and a plaintiff's complaint of inadequate

discussion is without merit.

In a one-paragraph assessment of Plaintiff's physical

impairments, ALJ Wolfe determined that Plaintiff did not have an

impairment or combination of impairments that met or equaled Listing 1.04 or 1.02.

> The medical evidence regarding the claimant's lumbar and cervical spine disorders does not include evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04 (Ex. 5F/3-7 [R. 223-27]). Moreover, the claimant's back disorder has not resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b). He is able to ambulate independently (4F [R. 214-19]). For the same reason, the claimant's hip impairment does not meet the requirements of Listing 1.02.

(R. 43.)

Plaintiff first claims the ALJ erred in this analysis because diagnostic imaging cited by the ALJ "unambiguously establishes medically determinable cervical and lumbar spinal stenosis." (Doc. 18 at 26 (citing R. 222-27).) A review of the referenced diagnostic imaging studies shows that Plaintiff correctly evaluates the findings recorded in the April 14, 2014, Radiology Reports. MRI of the cervical spine showed mild left greater than right neural foraminal stenosis and mild spinal canal stenosis at C3-C4; moderate to severe bilateral neural foraminal and moderate spinal canal stenosis at C4-C5; severe right and moderate left neural foraminal stenosis and moderate spinal canal stenosis at C5-C6; and moderate to severe right neural foraminal stenosis and mild spinal canal stenosis at C6-C7. (R. 223-24.) MRI of the lumbar spine showed moderate to severe spinal canal stenosis and moderate right

23

greater than left neural foraminal stenosis at L4-L5; and mild left neural foraminal stenosis at L5-S1. (R. 226.) These diagnostic findings show that the ALJ did not properly assess the evidence relied upon in concluding that the medical evidence does not include evidence of spinal stenosis. (*See* R. 43.)

Concerning ALJ Wolfe's additional assessment that the claimant's back disorder has not resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b)b), with citation to evidence that he "is able to ambulate independently" (R. 43 (citing Ex 4F [R. 214-19]), Plaintiff reviews evidence of record and concludes that "the ALJ erred by necessarily equating the ability to 'ambulate independently' with the ability to 'ambulate effectively,'" (Doc. 18 at 31.) The Court agrees that the ALJ's single specific finding regarding ambulation--that "[h]e is able to ambulate independently" (R. 43)--cannot be deemed substantial evidence in support of the conclusion that Plaintiff's "back disorder has not resulted in an inability to ambulate *effectively*" (R. 43 (emphasis added)) where the definition of "inability to ambulate effectively" encompasses far more than ability to ambulate independently, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b, and the record contains evidence which arguably supports the contention that Plaintiff was "incapable of sustaining a reasonable walking pace over a significant distance to be able to carry out activities of daily living," *see id.* § 1.00B2b(2). (*See* Doc. 18 at

24

30-31 (citing R. 653, 654, 798, 812, 813, 814, 816, 820, 822, 855).)

Because the ALJ improperly assessed probative evidence supporting disability, the Court cannot conclude that her step three assessment of Plaintiff's physical impairments is supported by substantial evidence. The Court also concludes this claimed error is cause for reversal or remand because the record suggests that proper consideration may have resulted in a disability finding at step three.

Further, were the Court to consider the specific arguments now advanced by Defendant in support of the ALJ's assessment, the same conclusion would be warranted. Although evidence now cited by Defendant in support of the opinion assessments cannot be considered substantial evidence in support of the step three determination because this Court can only review the Decision based on the ALJ's rationale and findings, *SEC v. Chenery*, 318 U.S. 80, 87 (1943); *Fargnoli*, 247 F.3d at 44 n.7; *Sykes v. Apfel*, 228 F.3d 259, 271 (3d Cir. 2000), consideration of the the evidence relied upon by Defendant is relevant to the Court's determination of whether an award of benefits rather than remand is appropriate in this case. As explained in *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984), the decision to "to award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates

that the claimant is disabled and entitled to benefits." *Id.* at 221-22; *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 358 (3d Cir. 2008).

Defendant asserts the ALJ's step three determination is supported by substantial evidence for the following reasons: 1) with respect to his lumbar spine impairments, the record contains no evidence of a positive straight leg raising test in both the sitting and supine positions as is required by Listing 1.04A (Doc. 21 at 8); 2) regarding cervical spine impairments, "Plaintiff has not pointed to evidence of *motor loss* (atrophy with associate muscle weakness or muscle weakness) accompanied by sensory or reflex loss" (*id.* at 9); and 3) evidence showed that physical examination results were often unremarkable and within normal limits (*id.* (citing R. 46, 415-16, 432, 694, 706, 715, 737, 776, 957, 976)).

Contrary to Defendant's contention that the record does not contain the requisite evidence of a positive straight leg raise test in the sitting and supine positions (Doc. 21 at 8), the consulting examiner explicitly made such a finding when he recorded that straight leg testing was 40 on sitting right and left, and supine.[4]  (R. 217.)

---

[4] The test is positive if the patient experiences sciatic pain when the straight leg is at an angle of between thirty and seventy degrees.  http://sciencedirect.com/topics/neuroscience/straight-leg-raise.

With Defendant's emphasis on "motor loss" in the assertion regarding Plaintiff's cervical spine impairments (Doc. 21 at 9), she points to a March 27, 2014, finding that the nerve conduction velocity test "'showed sensory more than motor mixed axonal demyelinating neuropathic changes.'" (Doc. 21 at 9 (quoting R. 659, 773).) Defendant adds that this finding was made "without a firm observation of motor loss." (*Id.*) Although Defendant cites the record for this proposition, the cited material does not state that "a firm observation of motor loss" is lacking. (*See* R. 659, 773.) The study's conclusion that there were "sensory more than motor . . . changes," (R. 659) does not support a conclusion that the study showed no evidence of motor loss. On the contrary, the electrodiagnostic data showed positive findings in the three identified categories and specifically set out positive findings in certain muscles. (R. 658-59.) Further, the study did not address clinical assessment of motor loss in that the Conclusion noted that "[t]he clinical correlation is required." (R. 659.) As set out in Plaintiff's reply brief, the record establishes Plaintiff's bilateral hand numbness, decreased range of cervical motion, decreased right hand grip strength, and the progression of bilateral arm pain. (Doc. 24 at 1 (citing R. 773, 775, 694, 957).) Evidence of record shows the March 27th studies were done to assess Plaintiff's complaints of bilateral hand numbness and weakness supported by physical exam. (*See* R. 657, 774, 777.)

Defendant's reliance on evidence showing that "physical examination results were often unremarkable and within normal limits" (Doc. 21 at 9 (citing R. 46, 415-16, 432, 694, 706, 715, 737, 776, 957, 976)) is misplaced. First, Listing 1.04 does not *require* consistent physical examination findings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Second, VA records document numerous clinical findings, including restricted lumbar flexion and extension as well as limited bilateral lateral flexion and rotation and localized tenderness or pain to palpation of the lumbar spine, paraspinal and SI joint tenderness with palpation and movement. (R. 822, 824.) Moreover, medical records show that Plaintiff's spinal condition caused frequent pain flares and several limitations were related to repetitive use. (*See*, *e.g.*, R. 821-24.) If impairments are aggravated by activities, as documented here (*see*, *e.g.*, R. 823-24), and are characterized by pain flare-ups (*see*, *e.g.*, R. 821), stationary examination will not necessarily regularly reveal symptoms otherwise documented in the record and supported by diagnostic testing.

The foregoing analysis indicates the evidence relied upon by Defendant to show that Plaintiff failed to establish that his impairments did not meet Listing 1.04A does not in fact make such a showing. Having discounted the impediments identified by Defendant to satisfying the listing requirements, the Court concludes reversal and award of benefits is the appropriate disposition. *See*

28

*Podedworny*, 745 F.2d at 221-22.

Although this determination renders extensive discussion of Listing 1.04C unnecessary, evidence of record suggests that Plaintiff's walking difficulties may have rendered him incapable of "sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. Evidence cited above shows that Plaintiff's spinal impairments interfered with his ability to walk and this was identified as a contributing factor in the VA disability analysis. (R. 823.) Dr. Kozicki, the consulting examiner, concluded that Plaintiff would be severely limited in his ability to walk in an eight-hour day. (R. 218.) Plaintiff testified about limitations in his daily activities, including difficulty walking at a normal pace (R. 65-66), and Dr. Gryczko opined that Plaintiff's description of "daily activities that are significantly limited" were "consistent with the limitations indicated by other evidence in this case." (R. 94.) While further development of the record regarding whether Plaintiff was incapable of effective ambulation could clarify the extent of his limitation, remand for this purpose is not warranted given the conclusion regarding Listing 1.04A and the fact that Plaintiff himself could not shed more light on the issue given his death on August 28, 2017.

**B.    Residual Functional Capcaity**

The Court briefly addresses Plaintiff's argument that the ALJ improperly assigned great weight to Dr. Gryczko's opinion because the opinion was not based on a review of the complete medical record including diagnostic imaging and treating physician records from January 2014 through October 2015. (Doc. 18 at 32.) As this is a case where diagnostic testing supported complaints of worsening symptoms and limitations (*see*, *e.g.*, R. 224, 226-27, 772), reliance on the State agency reviewer's opinion is problematic. *See Batdorf v. Colvin*, 206 F. Supp. 3d 1012, at 1024 (M.D. Pa. 2016). While remand for further consideration of this issue would be appropriate in some instances, *see id.*, the Court's step three determination and Plaintiff's death support reversal and award of benefits in this case.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted. The Acting Commissioner's decision is reversed and this matter is remanded for prompt award of the benefits owed Plaintiff as of the alleged disability onset date of August 1, 2012. An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: November 21, 2017